**I**N THE **U**NITED **S**TATES **D**ISTRICT **C**OURT
**FOR THE** **D**ISTRICT OF **N**EW **M**EXICO
_____

MEDITE CORPORATION, a Delaware corporation,

                Plaintiff,

v.                                                                      No. CIV 96-0929BB/RLP

PUBLIC SERVICE COMPANY OF NEW MEXICO, a New Mexico corporation,

                Defendant.

## MEMORANDUM OPINION

THIS MATTER is before the Court on several motions and cross-motions for partial summary judgment, designed to limit the issues for trial (Docs. 98, 105, 114, 119). The Court has considered the submissions of the parties and the relevant case law, and finds as follows: (1) Plaintiff's ("Medite") motion for partial summary judgment limiting Defendant's ("PNM") counterclaim (Doc. 98) will be DENIED; (2) PNM's cross-motion for summary judgment concerning the same issue (Doc. 105) will be GRANTED; (3) PNM's motion for partial summary judgment based on the filed-rate doctrine (Doc. 114) is rendered moot; and (4) PNM's motion for partial summary judgment concerning commercial impracticability and uncontrolled forces (Doc. 119) will be DENIED.

**Standard for Summary Judgment**

"Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable

to the nonmoving party." Id. On a motion for summary judgment, the issue is "not whether [the court] thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Nevertheless, a jury question does not exist because of the presence of a mere scintilla of evidence; rather, there must be a conflict in substantial evidence to create a jury question." Walker v. NationsBank of Florida, 53 F.3d 1548, 1555 (11th Cir. 1995). In addition, a motion for partial summary judgment filed under Rule 56 may be used to limit the issues for trial and establish facts, even if no claim in the lawsuit is disposed of entirely. Cook v. Rockwell Int'l Corp., ___ F.Supp. ___, 1998 WL 433867, fn.13, *16 (D.Colo. 1998). The Court will consider the various motions filed in this case in light of these standards.

## I. Medite's Motion for Partial Summary Judgment and PNM's Cross-Motion for Same

### A. Undisputed Facts

These motions are based on Medite's contention that the minimum-monthly-charge requirement contained in the electrical service agreement (ESA) was only in effect during the initial five-year term of the ESA. According to Medite, once that five-year term expired, PNM had no more claim for liquidated damages (in the form of the minimum monthly charge) under the ESA but, instead, was limited to any actual damages it could prove. PNM, on the other hand, argues the minimum-monthly-charge provision, or "CCS" charge, was automatically renewed along with the rest of the ESA and remained in force until the ESA was terminated. PNM has claimed entitlement to over two years of monthly CCS charges on the basis of this argument. The Court previously ruled that the language of the ESA is ambiguous concerning this question, and denied summary judgment to either party. Since the Court issued its prior opinion the parties have performed further discovery and both parties now again ask the Court to grant summary judgment.

The following is a summary of the undisputed facts presented to the Court with respect to this issue. After purchasing a fiberboard manufacturing plant from its predecessor, Medite demonstrated an ability to build and operate a cogeneration system that would provide its own electricity. PNM

had previously obtained regulatory approval of Rate 101, a load retention rate, from the New Mexico Public Service Commission. Rate 101 was a lower rate than the rate charged regular industrial customers, and was to be granted only to customers who consumed large amounts of electricity and who proved a readiness and ability to build a wood-fired cogeneration plant. Rate 101 was designed to induce such customers to remain in the PNM system rather than build a cogeneration plant. This would benefit PNM and PNM's ratepayers by maintaining contributions to PNM's fixed costs that would otherwise be lost, thus helping to keep the other ratepayers' electricity rates from rising. Rate 101 also benefits the customer because it is a lower rate than the rate that would normally be charged, and the customer is not required to construct and operate a cogeneration system. Rate 101, however, is only available during periods in which PNM has excess capacity. Once that excess capacity disappears, the customer must choose between paying higher electric rates and actually building its cogeneration system.

The Electric Service Agreement ("ESA") involved in this case is based on the requirements of Rate 101. The lower rate charged for the CCS portion of Medite's electricity consumption was $.035/kWh, the same as that established in Rate 101. The remainder of Medite's consumption was charged at one of PNM's regular rates, also as provided for in Rate 101. Rate 101 also includes an explicit requirement that, "Except as the contract may otherwise provide, in the event the customer terminates service prior to the end of the initial or extended term of the contract, the customer shall pay the CCS minimum monthly charge for the remainder of the contract term." The purpose of this requirement, according to one expert's deposition testimony, was to protect PNM and PNM's ratepayers from a sudden loss in revenue from a customer who had been receiving the benefit of the lower Rate 101.

The question in this case, of course, is whether the ESA does "otherwise provide" and eliminates the minimum CCS charge following expiration of the initial five-year term of the contract. Medite argues that it does so, and points to Section 1.2 of the ESA. Section 1.2 states that if Medite discontinued or interrupted service prior to the end of the five-year initial term of the ESA, Medite

was required to pay the CCS charge for the remainder of the initial term. Since this section is silent as to any requirement to pay the CCS charge during any extended term, Medite claims, the CCS charge is explicitly limited to the initial five-year term.

PNM, on the other hand, relies on Section 1.1 of the ESA, which sets the initial term and then provides for automatic renewal of the agreement from year to year, with a two-year advance-notice requirement for termination of the ESA. According to PNM, when the ESA was automatically renewed, all of its provisions (including the minimum CCS-charge requirement) were also automatically renewed. For the reasons discussed below, the Court finds the PNM argument more consistent with the contract language, especially when interpreted in the regulatory milieu in which the ESA was forged.

### B. Medite's Arguments

Medite first argues the minimum-charge provision is a forfeiture clause that must be strictly construed against such forfeiture. This argument, however, is foreclosed by the fact the provision has been approved, and in fact is required (unless expressly disavowed), by a regulatory agency acting for the protection of other ratepayers. The reason for construing forfeiture clauses strictly is that such clauses are not favored in the law. The same cannot be said, however, for a requirement established by a regulatory body generally possessing much greater expertise in the area than the courts. Given the regulators' involvement in the establishment of the minimum-charge provision, there is no reason to construe the provision strictly against applying it. Furthermore, such strict construction may violate the filed-rate doctrine, which precludes legal attack on any rate approved by the governing regulatory agency. See Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 18 (2d Cir. 1994). Accordingly, the Court will not construe the ESA with a bent toward eliminating the minimum-charge requirement.

Medite also contends the ESA should be construed against PNM because PNM drafted it. However, both Medite and PNM are large companies of relatively equal bargaining power, and the ESA was the product of negotiation between the parties. Therefore, the practical justifications

4

underlying the doctrine of *contra proferentem* do not apply in this case. See Terra Int'l, Inc. v. Mississippi Chemical Corp., 119 F.3d 688, 692 (8th Cir. 1997). Furthermore, as the Court discusses below, the circumstances of this case provide a clear indication of the parties' intentions, and there is no reason to resort to construing the ESA against the party that primarily drafted it. See Crawford Chevrolet, Inc. v. The National Hole-in-One Ass'n, 828 P.2d 952, 954 (N.M. 1992) (rule that insurance contract should be construed against insurer does not preclude court from examining facts to determine meaning of contractual language).

      Medite maintains PNM cannot now rely on its unexpressed intent to have the minimum-charge provision continue in force past the initial five-year term. PNM, on the other hand, contends Medite is the party now relying on previously-unexpressed intent. Both of these contentions are but conclusory statements glossing over the heart of the issue – what was the intent of the parties when they negotiated the ESA? For that reason, the Court will not address this argument separately, but as part of the discussion of the ultimate merits of the parties' motions.

      Finally, Medite relies on PNM's treatment of a prior ESA, signed in 1983 between Medite's predecessor (a PNM affiliate) and PNM. During negotiations with Medite over termination of the 1983 ESA and replacement of that ESA with the current ESA, PNM determined the early-termination provision of the prior ESA would be in effect only for the initial seven-year term of the ESA. According to Medite, this is proof of a course of dealing with respect to early-termination provisions that supports its interpretation of the current ESA. The Court finds, however, that the factual settings of the two agreements are so different as to render the interpretation of one essentially irrelevant as an indicator of the parties' intent concerning the other.

      The most significant difference between the two early-termination provisions is the purpose behind each one. The 1983 ESA expressly states that the termination charge is "based upon, and in consideration of, PNM's investment in the Facilities and the total PNM integrated system capacity and capital required to provide the services as set forth in this Agreement." Another provision of the 1983 ESA is an express agreement that the termination charge is a good faith estimate of the actual

5

amount of damages PNM would suffer from a termination of the agreement without adequate notice. In other words, the early-termination charge in the 1983 ESA is a standard liquidated-damages provision designed to ensure PNM recouped the cost of installing new facilities and other capital expenditures and costs. There is no evidence the termination charge in the 1983 ESA was approved or required by a regulatory agency. The current ESA's minimum-charge provision, on the other hand, contains no language indicating its purpose was to reimburse PNM for any facilities that may have been constructed during the life of the contract. Instead, the purpose of the provision was to protect PNM and its ratepayers from the sudden loss of a large customer, one who had been paying a special lower rate for its electricity. Furthermore, the formula for determining the minimum charge was established by a regulatory agency that specifically required the minimum-charge provision remain in force during any extended term of the ESA, unless the parties otherwise provided.

The Court also notes the interpretation of the termination provisions of the 1983 ESA occurred during the course of negotiations with Medite concerning its decision to either build a cogeneration plant or be granted the special cogeneration rate for electricity purchased from PNM. The PNM official who interpreted the 1983 ESA was surprised he had ignored the five-year advance notice requirement in that ESA, decided his interpretation of the ESA had been erroneous, and surmised that the wrong termination charge had been imposed because of the pending negotiations with Medite and the possibility of having Medite replace the prior customer. Significantly, there has been no testimony that Medite officials relied on PNM's interpretation of the 1983 ESA to form any opinion concerning the minimum-charge provisions of the current ESA. No one testified that PNM's limitation of the 1983 termination charge to the initial contract period induced a belief that a similar limitation would apply to the current ESA. Absent such testimony, and given the major differences in circumstances between the 1983 ESA and the current ESA, there is no room for a course-of-dealing argument.

### C.  Court's Interpretation of ESA

6

Having rejected Medite's origin and historical arguments concerning the manner in which the ESA should be construed, the Court reverts to the following premise: since the Public Service Commission explicitly required the continuation of the minimum CCS charge in any extended period of the ESA, unless the contract otherwise provided, there is a presumption that the minimum-charge provision as well as the rest of the ESA was automatically renewed after the initial five-year term expired. The Court notes that Section 1.2 of the ESA does not state the minimum-charge provision applies only during the initial five-year term; instead, it is silent concerning what should happen after the initial term has passed. Furthermore, Sections 7.3 and 7.4 of the ESA, which establish that the CCS charge is a monthly minimum charge unless the uncontrollable-force provision applies, do not contain any limitation to a specific time period. Medite's proposed interpretation of the ESA would read these provisions out of the ESA after the first five years, despite the absence of any direct evidence the parties intended such a result and the express requirement in Rate 101 that the minimum-charge provision continue in effect.

The ESA must be read as a whole, not in a segmented manner. See Nearburg v. Yates Petroleum Corp., 123 N.M. 526, 536, 943 P.2d 560, 570 (Ct. App. 1997). The Court therefore should not interpret the ESA in a manner that would render one or more of its provisions inoperative. Id. This is especially so, given the lack of any evidence that Medite and PNM negotiated the continued validity, or lack thereof, of the minimum-charge provision after the initial five-year term expired. The continued application of the minimum-charge provision was obviously important to the regulators, and both parties are presumed to be familiar with Rate 101, which was incorporated into the ESA. It is obvious to the Court, therefore, that the parties would have been much more explicit in the ESA had they intended to expressly override the Rate 101 provision regarding continued existence of the minimum-charge provision. Therefore, the Court finds the extrinsic evidence submitted by the parties supports a determination that the minimum-charge provision of the ESA applied during the extended term of the contract as well as during the initial term. Summary judgment will be granted PNM on this point.

**II. PNM'S Motion Concerning Filed-Rate Doctrine**

PNM filed this motion for partial summary judgment in an effort to preclude Medite from arguing that the minimum-charge provision constitutes a forfeiture, a windfall, or a penalty, or is otherwise inequitable. In response, Medite argued only that it does not challenge the minimum-charge provision itself. Instead, Medite maintains the ESA "provided otherwise" and ensured that the minimum-charge provision did not continue to apply after the initial five-year term expired. The Court has addressed that argument in the preceding section. PNM's motion is therefore moot, and the Court need not address it.

**III. PNM's Motion Concerning Commercial Impracticability**

When the fiberboard plant was built by Medite's predecessor, a series of disputes arose over the amount of pollutants emitted during the plant's operations. The plant was always near the edge, and sometimes over the edge, of the boundary between a minor source and a major source of pollutants. The difference between the two categories is significant--a major source requires a prevention-of-significant-deterioration ("PSD") air quality permit, and is subject to a requirement that it use the best available control technology ("BACT"). A minor source, on the other hand, is subject to much less rigorous requirements. At the time Medite purchased the plant, the plant was operating as a minor source under a permit issued by the New Mexico Environment Department. Subsequently, in January 1995, information submitted by Medite showed the plant was a major source of several pollutants, and Medite was required to obtain a PSD permit and utilize BACT to control the emissions. Medite determined that the cost of installing and operating BACT would be exorbitant (at least in its view) and decided to shut down the plant. Medite also notified PNM that the force-majeure or uncontrollable-forces clause of the ESA had been triggered, and that it would be paying PNM the corresponding monthly payments applicable after the clause has been properly invoked. PNM maintains the force-majeure clause does not apply to the situation at hand and has moved for partial summary judgment.

The force-majeure clause of the ESA, Article 13, states in pertinent part (as paraphrased) that Medite shall not be considered to be in default under the ESA if its failure of performance is due to uncontrollable forces. The term "uncontrollable forces" is defined to include any cause beyond the control of the party affected, including an inability to obtain permits or other authorizations from any governmental agency, if that inability causes Medite to discontinue operations. In addition, the inability to obtain the necessary authorization must be such that Medite could not reasonably have been expected to avoid the difficulty by the exercise of due foresight, and that Medite could not overcome the problem by the exercise of due diligence. If Medite's cessation of operations was caused by such an uncontrollable force, the termination charges it must pay to PNM are much lower than the minimum-charge amounts discussed in the first section of this opinion.

PNM interprets Article 13 to require that Medite's inability to obtain the PSD permit have been the result of an intervening change in the applicable law or regulations. Otherwise, argues PNM, such inability as a matter of law cannot qualify as an uncontrollable force. In other words, PNM maintains the law or regulations must have changed after Medite purchased the plant, and the mere fact the PSD permit was not required until five years later does not constitute such a change.[1] PNM arrives at this "supervening cause" position by relying on International Minerals and Chemical Corp. v.Llano, Inc., 770 F.2d 879 (10th Cir. 1985). According to PNM, Llano stands for the proposition that any force-majeure clause must be read with the common law of commercial impracticability superimposed on the clause. In this case, contends PNM, Article 13 must include the common-law requirement that the event or action claimed as a force-majeure event be a supervening or intervening occurrence, or change in law, not foreseen by the parties.

---

[1] PNM also argues the PSD permit requirement was readily foreseeable by Medite at the time of contracting, due to the plant's history of air-quality problems. The supervening-cause question discussed in the opinion is merely one aspect of the general common-law requirement that force-majeure events be unforeseeable at the time of contracting. The Court will therefore discuss the foreseeability requirement and the supervening-change-in-law requirement interchangeably and will not separately discuss the foreseeability issue.

9

PNM's interpretation of Llano reads far too much into that opinion. Llano merely construed one phrase of the subject contract–"unable to receive gas"–in light of the common law existing in New Mexico at the time of contracting. 770 F.2d at 886. The Llano opinion did not say that every aspect of commercial-impracticability law is automatically grafted onto every force-majeure clause. To do so would render most such clauses useless, because the law of impracticability would control over any language contained in the clauses. See, e.g., P.J.M. Declercq, Modern Analysis of the Legal Effect of Force Majeure Clauses in Situations of Commercial Impracticability, 15 J. L. & Com. 213, 225 (1995) (discussing force-majeure clauses containing general language, which are construed in accordance with commercial-impracticability law; noting that such construction devalues the clauses to nothing).

The proper way to interpret a force-majeure clause is to respect the parties' freedom to contract and attempt to discern the parties' intent, which is the same methodology employed in interpreting any contract provision. See Llano, 770 F.2d at 884 (court's primary objective in interpreting a contract is to ascertain the intention of the parties); Commonwealth Edison v. Allied-General Nuclear Servs., 731 F.Supp. 850, 855-56 (N.D.Ill. 1990) (merely reciting standard, boilerplate force-majeure provision invokes body of common law largely indistinguishable from doctrine of impracticability; however, specific delineation of circumstances constituting a defense to duty to perform makes contract, not impracticability law, controlling); Declercq, 15 J.L. & Com. at 224 (citing commentary to U.C.C. impracticability provision; pointing out that impracticability doctrine only fills gaps left by parties, while allowing parties to specifically contract for certain circumstances).[2]

---

[2] Of course, in determining the parties' intent, it is sometimes necessary to resort to impracticability law to interpret terms contained in a force-majeure clause. In this case, for example, the parties used the word "inability" to obtain the necessary permits. It is obvious that there was no absolute "inability" to obtain the PSD permit, if Medite simply paid enough money. However, as in Llano, the law of commercial impracticability is used to define "inability" to actually mean "inability to obtain a permit at anything other than a commercially impracticable cost."

This is not a case of the type discussed by Judge Posner in Commonwealth Edison, involving a vague and general phrase echoing force majeure, such as "act or order of a governmental agency." If it were, PNM's argument would be more persuasive. As Judge Posner noted, general phrases in a force-majeure provision trigger application of common-law interpretations of such provision, including the requirement that the cause of a party's inability to perform be a supervening cause not anticipated by the parties. See, e.g., Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 990 (5th Cir. 1976) (exculpatory provisions phrased in general terms are construed as excusing only unforeseen events that make performance impracticable). This is so because in interpreting force-majeure provisions, courts are attempting to ascertain where the parties placed the risk of a particular occurrence. Where a particular risk exists or is readily foreseeable at the time of contracting, and the parties merely recite a general or boilerplate force-majeure provision, courts will presume the risk has been assumed by the party whose performance will be affected by the realization of that risk. See generally United States v. Winstar Corp., 116 S.Ct. 2432, 2469-70 (1996); Eastern Air Lines, 532 F.2d at 991-92. That is, if a party is prevented from performing by an event that was foreseeable at the time of contracting or a law already in existence, and rather than expressly assigning the risk of that event the parties recited only general force-majeure language, a court reviewing the agreement will decide the event was not included in the general language of the force-majeure provision. On the other hand, where the parties have specifically assigned the risk of a certain occurrence, courts will not require the risk to have been unforeseeable at the time of contracting. Eastern.

In this case, the parties specifically contemplated the possibility that either PNM or Medite would be prevented from operating by an inability to obtain necessary permits or other governmental authorization. The parties also decided that such inability, provided the other requirements of Article 13 were met, would relieve Medite of the obligation to pay the minimum CCS charge and, instead, would trigger the lower payment requirements found in Section 7.4 and Attachment C. This assignment of risk is not a general, catch-all provision, but a specific statement of excuse from

11

performance. Furthermore, nothing in Article 13 intimates the inability to obtain a permit must result from an intervening change in the law or regulations. For that reason, the Court will not adopt PNM's proposed requirement that only supervening changes in law or regulation may constitute an uncontrollable force under the ESA. See Eastern; Sabine Corp. v. ONG Western, Inc., 725 F.Supp. 1157, 1170 (W.D.Okla. 1989) (interpreting clause similar to the one involved in this case, and refusing to impose unforeseeability requirement where force-majeure clause did not specify such a requirement). PNM's motion for partial summary judgment on this point will be denied.

**Conclusion**

Based on the foregoing, the Court will deny Medite's attempt to limit PNM's counterclaim to PNM's actual damages. The Court will also deny PNM's attempt to prevent Medite from relying on the uncontrollable-force argument. Finally, PNM's motion regarding the filed-rate doctrine is moot and will be denied on that basis.

An Order in accordance with this Memorandum Opinion will issue.

Dated this 28th day of September, 1998.

*[signature]*

**BRUCE D. BLACK**
United States District Judge